564 P.2d 1321

STATE of New Mexico,
Plaintiff-Appellee,

v.

Franklin HARRISON, Jr.,
Defendant-Appellant.

No. 10726.

Supreme Court of New Mexico.

May 19, 1977.

Rehearing Denied June 8, 1977.

Pickard & Singleton, Santa Fe, for defendant-appellant.

Theodore E. Lauer, Santa Fe, for amicus curiae.

Toney Anaya, Atty. Gen., Albert V. Gonzales, Don Montoya, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

OPINION

SOSA, Justice.

Defendant Franklin Harrison, Jr. was indicted for felony murder, kidnapping and rape. The jury convicted him of false imprisonment and felony murder. Defendant was sentenced to one to five years and to death. Defendant appeals from the felony murder conviction and the death sentence.

The facts pertinent to this appeal are as follows: Defendant and Emmett Cunejo, co-indictee, were driving about in the vicinity of Gallup, New Mexico on May 2, 1975. They had two rifles, a handgun, and ammunition with them to go prairie dog hunting. After having done some shooting and target practicing, at about six in the evening they came upon the victim, Susan Brown, who was walking alongside the highway. They decided to stop and to give her a ride. What happened after this event varies in the statements, deposition, and testimony given. Either Mrs. Brown ran away, was caught and tripped by the defendant, was struck in the mouth, and was dragged back to the car, or she resigned herself to going along with them but tripped and fell to the ground, causing her lips and mouth to bleed. The medical examiner testified that Mrs. Brown had sustained a hard blow to the mouth. They then drove to a remote area known as the Hog's Back near Gallup. Having been told to "take a walk," Cunejo left the defendant and Mrs. Brown in the car and practiced shooting with one of the rifles far from the car.

Cunejo returned after some time, picked up a beer and more ammunition, left, returned, got in the back seat, noticed the handgun, and picked it up. He pulled the trigger a few times, thinking the gun was unloaded. A shot went off and Mrs. Brown, who was in the front seat with defendant, slumped in the defendant's lap, the bullet having gone through her head, probably killing her instantly. Defendant and Cunejo panicked. They spent the next few days trying to dispose of the cadaver, getting drunk, and destroying evidence. During a transfer of the cadaver to another place, they ran what appeared to be a road block and hit a car in the process, whereupon they threw the cadaver out of the car. They were arrested shortly thereafter.

On May 10 Emmett Cunejo gave his statement to the police concerning the events of May 2. On May 12 he gave another, differing statement. On August 9 Emmett Cunejo was deposed and he related still another version of the May 2 events.

At that deposition Cunejo stated he was coerced and tricked into giving his May 10 and May 12 statements. On October 29 a second deposition was taken of Mr. Cunejo, where he again claimed he was coerced and tricked. While incarcerated, Emmett Cunejo sent a letter to the defendant, which was intercepted. It related another but basically similar to the depositions' version of the events.

Prior to trial, defendant moved for a polygraph examination and requested the State to pay for it. The motion was granted. Defendant failed the polygraph test.

At trial, Emmett Cunejo, who had pled guilty to kidnapping and second-degree murder, testified on behalf of the State. The State then proceeded to impeach his testimony by using his prior statements and the letter, thereby presenting its version of the circumstances leading to Mrs. Brown's death. The State's version was that the defendant sought to force the woman into the car by intimidation (a rifle was sticking out of the car), tripped and punched her when she ran away, that later the defendant had sexual relations with Mrs. Brown against her will, and that finally Cunejo and the defendant killed her to silence her. The medical evidence presented was to the effect that a gunshot wound had caused Mrs. Brown's death, that the other injuries were caused by the cadaver being thrown out of the car, with the exception of some facial injuries which were apparently caused by a forcible blow, that there was no evidence of forcible sexual intercourse, and that the acid phosphatase found in the vagina was consistent with sexual relations three days prior to her death. Mrs. Brown's husband testified that he had intercourse with his wife three days before her death.

Defendant Harrison took the stand and testified to essentially the same story Cunejo had told. The trial court then allowed the State to impeach his testimony on the basis of the failed polygraph examination. At the close of the trial, defendant submitted on his own a jury instruction on

false imprisonment. The jury returned a verdict of guilty as to felony murder and false imprisonment, but it found the defendant not guilty of rape and kidnapping.

On appeal defendant argues that the felony of false imprisonment cannot be used for a conviction of felony murder and that the testimony of the polygrapher was improperly admitted as evidence.

The English common law origin of felony murder can be traced back to an early, relatively simple idea: any homicide committed during the perpetration or the attempted perpetration of a felony constituted felony murder, and death was the punishment. Since death also was the punishment for most felonies, it did not matter whether the defendant was put to death for committing the felony or for the homicide. Section 40A–2–1, N.M.S.A.1953 defines murder as: "[T]he unlawful killing of one human being by another with malice aforethought, either express or implied, by any of the means with which death may be caused." Section 40A–2–1(A)(3) defines felony murder: "Murder in the first degree consists of all murder perpetrated: . . . (3) in the commission of or attempt to commit any felony; . . . ." Despite the broad wording of the statute, felony murder has evolved to the point that today various limitations have been placed on it. Depending on the jurisdiction, those limitations, both statutory and judicial, include the following: (1) there must be a causal relationship between the felony and the homicide, (2) the felony must be independent of or collateral to the homicide, and (3) the felony must be inherently or foreseeably dangerous to human life. See Annot., 50 A.L.R.3d 397 (1973); Annot., 40 A.L.R.3d 1341 (1971); Crum, "Causal Relations and the Felony-Murder Rule," 1952 Wash.U.L.Q. 191; Arent, "The Felony Murder Doctrine and its Application under the New York Statutes," 20 Cornell L.Q. 288 (1935).

The appellant argues that there was no causation in this case. He argues there was no causal connection between the false imprisonment and the homicide, thus felony murder does not apply. The traditional test of felony murder is that the homicide must be so clearly connected to the felony as to fall within the res gestae thereof. See *State v. Flowers,* 83 N.M. 113, 489 P.2d 178 (1971); *Nelson v. Cox,* 66 N.M. 397, 349 P.2d 118 (1960); *State v. Nelson,* 65 N.M. 403, 338 P.2d 301 (1959), cert. denied, 361 U.S. 877, 80 S.Ct. 142, 4 L.Ed.2d 115 (1959). It was further elucidated in *State v. Adams,* 339 Mo. 926, 933, 98 S.W.2d 632, 637 (1936):

> It is held in many jurisdictions, including Missouri, that when the homicide is within the res gestae of the initial crime and is an emanation thereof, it is committed in the *perpetration* of that crime in the statutory sense. Thus it has been often ruled that the statute applies where the initial crime and the homicide were parts of one continuous transaction, and were closely connected in point of time, place and causal relation . . . ..

Professor Crum has pointed out some of the problems with the res gestae rule:

> On the surface, and at first reading, this would appear to be a fairly clear and explicit statement of an easy rule to follow. But consider for a moment what the court is actually saying: if the death occurred during the course of a criminal transaction, it is murder. The death occurred during the course of criminal transaction if it was closely related in point of time and place *and if there was a causal relation.*
>
> Such a statement, it is submitted, does not solve the problem. It does not aid analysis to say that a connection between a felony and a homicide exists if the homicide fell within the res gestae of the crime, and that the homicide fell within the res gestae of the crime if a connection between the homicide and the crime existed. The essential nature of the connection is not defined by such logic. 1952 Wash.U.L.Q. at 196.

Clearly a more exact definition of causation is required. We define it as follows: causation must be physical; causation consists of those acts of defendant or

his accomplice initiating and leading to the homicide without an independent force intervening,[1] even though defendant's or his accomplice's acts are unintentional or accidental. Causation in the final analysis primarily deals with the *actus reus* of the crime.

■ Our felony murder statute conclusively presumes that any homicide occurring during any felony is first-degree murder. But the *mens rea* of first-degree murder requires malice aforethought or a greatly dangerous act without regard to human life. To presume conclusively that one who commits *any* felony has the requisite *mens rea* to commit first-degree murder is a legal fiction we no longer can support. In felony murder cases where the felony is a first-degree felony such a presumption is appropriate, but not where the felony is of a lesser degree. This presumption is inappropriate today for lesser-degree felonies where moral, social, and penal considerations dictate that criminal liability should be imposed according to moral culpability. Thus, we now adopt an additional test, the natural and probable consequences test, first announced in *Regina v. Serne*, 16 Cox C.C. 311 (1887), and which has today evolved into what is called the inherently or foreseeably dangerous to human life test. Of the lesser-degree felonies only those known to have a high probability of death may be utilized for a conviction of first-degree murder. Assuming the *actus reus* condition is met, the *mens rea* of one who is committing a felony which is inherently or foreseeably dangerous to human life is sufficient to justify convicting a defendant of felony murder and sentencing him to death or life imprisonment.

■ Today the courts apply this test in two differing manners: (1) the felony is examined in the abstract to determine whether it is inherently dangerous to human life, *People v. Satchell*, 6 Cal.3d 28, 489

P.2d 1361, 98 Cal.Rptr. 33, 489 P.2d 1361 (1971), 50 A.L.R.3d 383 (1973); *People v. Williams*, 63 Cal.2d 452, 47 Cal.Rptr. 7, 406 P.2d 647 (1965), or (2) both the nature of the felony and the circumstances surrounding its commission may be considered to determine whether it was inherently dangerous to human life. *State v. Thompson*, 280 N.C. 202, 185 S.E.2d 666 (1972); *Jenkins v. State*, 230 A.2d 262 (Del.Sup.1967). We adopt the latter test. Professor Perkins stated in R. Perkins, Criminal Law 34 (1957):

> One who is perpetrating a felony which seems not of itself to involve any element of human risk, may resort to a dangerous method of committing it, or may make use of dangerous force to deter others from interfering. If the dangerous force thus used results in death, the crime is murder just as much as if the danger was inherent in the very nature of the felony itself.

In the final analysis this is for the jury to decide in each case, subject to review by the appellate courts.

■ In summary, in a felony murder charge, involving a collateral lesser-degree felony, that felony must be inherently dangerous or committed under circumstances that are inherently dangerous. In cases where the collateral felony is a first-degree felony, the *res gestae* test shall be used. In view of this decision, N.M.U.J.I. Crim. 2.04 [2d Repl. Vol. 6, N.M.S.A.1953 (Supp.1975), at 297] will have to be altered to conform herewith.

■ Second, appellant raises the issue that an indigent who requests to take a polygraph test at public expense should have the right to decide unilaterally whether the results may be used as evidence. Appellant sought a polygraph examination and the trial court approved it. Afterwards the defense counsel informed the State that the examination had been conducted and

---

1. A policeman who shoots at an escaping robber but misses and kills an innocent bystander would be considered a dependent, intervening force, and the robber would be criminally liable for felony murder under this test. Lightning striking and killing the bystander would be an independent, intervening force.

that the results thereof would not be disclosed to the State. Thereupon the State moved for disclosure pursuant to N.M.R. Crim.P. 28 [§ 41–23–28, N.M.S.A.1953 (Supp.1975)] and gave notice that it would call the polygraph examiner, Mr. Galbreth, as a witness for the State. Appellant objected and the trial court ruled that the examiner could not be called during the State's case in chief. The trial court later ruled that if appellant testified in his own behalf, it would then consider whether the state could call the examiner. After the appellant testified on his own behalf, the trial court ruled that the State could examine Mr. Galbreth over the objection of the defense counsel.

Appellant and amicus curiae, the New Mexico Criminal Defense Lawyers Association, argue that a defendant should have control of the use of the results of the polygraph examination under the theories of (1) privileged communications between attorney and client, (2) attorney work product, and (3) denial of due process and the equal protection of the laws. We dispose of the question before us on the following grounds. We feel that the rationale of *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) applies in the instant case. There, the United States Supreme Court held that a statement inadmissible against a defendant in the prosecution's case in chief because of lack of the procedural safeguards required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may, if its trustworthiness satisfies legal standards, be used for impeachment purposes to attack the credibility of defendant's trial testimony. That court stated:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See *United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); cf. *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

> The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements.

401 U.S. at 225–226, 91 S.Ct. at 646.

If the other prerequisites of polygraph examinations are satisfied, we hold that the statements made to the polygrapher and the results as to the truthfulness of those statements may be used for impeachment purposes. We uphold the limitation set by the trial court in this case: the results of a polygraph test may be used to impeach a defendant who takes the stand.

Defendant's conviction of felony murder is hereby set aside with directions to the trial court to order a new trial consistent with this opinion.

EASLEY and PAYNE, JJ., concur.

McMANUS, C. J., and FEDERICI, J., dissent.