1997-NMSC-023

940 P.2d 150

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Paul E. McGRUDER, Defendant–
Appellant.**

No. 23002.

Supreme Court of New Mexico.

May 5, 1997.

T. Glenn Ellington, Chief Public Defender, Sue A. Herrmann, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

Tom Udall, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

MINZNER, Justice.

1. Defendant Paul McGruder appeals from a judgment and sentence of life imprisonment plus ten years following a jury trial at which he was convicted of a number of offenses, including felony murder. This Court has jurisdiction of his direct appeal under Rule 12–102(A)(1) NMRA 1997 (direct appeal from life sentence). McGruder argues on appeal that the district court erred by (1) denying his request for a lesser included instruction on second degree murder; (2) sentencing him for both armed robbery and unlawful taking of a vehicle; and (3) permitting testimony of a prior identification on the ground that the photo array was impermissibly suggestive; he further argues that (4) his conviction of child abuse was not supported by substantial evidence. We affirm.

## I.

2. *Facts.* On the afternoon of April 24, 1994, Defendant McGruder indicated to an acquaintance, Robert Witt, that he was interested in purchasing a truck that was parked at a nearby apartment complex. McGruder had heard that the truck had a "for sale" sign and asked Witt and another acquaintance to get the phone number from the sign. McGruder then called that phone number and left a message that he wanted the truck and could pay $700 for it. Later that afternoon, McGruder and Witt went to the apartment complex parking lot to see if they could locate the truck's owner. There they met Kathie Brazfield, Jeff Villanueva, and Brazfield's two-year-old daughter. After Brazfield identified herself as the owner of the truck, she and her daughter returned to the apartment while Villanueva accompanied McGruder on a test drive.

3. Villanueva and McGruder returned from the test drive and parked the truck near the window of Brazfield's apartment. When Brazfield saw they were having difficulty opening the hood of the truck, she went out to open the hood for them. McGruder told her that he wanted to buy the truck, then shook hands with Villanueva and left. When Villanueva and Brazfield returned to her apartment, he told her that during the test drive he had been afraid McGruder was going to take the truck forcibly because McGruder had displayed a gun.

4. Later that same evening, Brazfield heard a knock on the door of her apartment. At the time she was dressing her daughter after a bath. Unable to answer the door, she asked Villanueva, "Who is it?" and he answered, "That black guy." Brazfield understood the answer as identifying the man with whom Villanueva had taken the test drive earlier in the day. Villanueva answered the door. Brazfield heard the door open, and she heard a loud bang a few seconds later. By then she and her daughter were in the bedroom.

5. McGruder came into the bedroom. Brazfield recognized him as the same man with whom Villanueva had driven earlier that day. McGruder pointed a gun at her, from a distance of about six feet, and demanded the keys to the truck. She had difficulty locating the keys and, while she was looking, going from room to room, McGruder continued to hold the gun and point it at her. She first found Villanueva's car keys. She offered these, but McGruder responded that he did not want the car, just the truck. After a few minutes, she found the keys to the truck. As she gave them to McGruder, he held the gun to her temple, threatening to kill her. She pleaded with him to let her live because of her daughter. In her testimony Brazfield described her daughter as "behind" her, although not "right behind her." She said her daughter was crying.

6. McGruder began to walk out of the apartment, but he returned. He again held a gun to Brazfield's temple and again threatened to kill her. He also said that if she "said anything" members of his gang would "get her." McGruder left the apartment without physically injuring either Brazfield or her daughter. However, he kicked Villanueva's body in the stomach and called him a "punk." Brazfield also testified that she thought McGruder took a wallet out of Villanueva's pocket but dropped it as he left the apartment.

7. Villanueva was killed by a single gunshot wound to the forehead from a distance of less than two feet. McGruder was found later that evening hiding in a closet in Robert Witt's apartment. Also found in the closet under some clothes was a gun, later shown to be the murder weapon.

8. Brazfield described her assailant to police as a black male with his hair done in braids. The next day, she identified McGruder from a photo array a detective brought to her. The photo array consisted of several photos of African–American males. All of them appeared to be darker-skinned than McGruder and he was the only one whose hair was braided. At trial Brazfield again identified McGruder. The State also introduced testimony that when Brazfield identified McGruder in the array, she appeared certain of her identification, and that she identified him after only a few seconds.

9. At the close of trial, McGruder requested a lesser included offense instruction

on second degree murder. The trial court denied his request, stating that there was no view of the evidence that would support a verdict of second degree murder. The court charged the jury on first degree, deliberate-intent murder as well as on felony murder. The instruction on felony murder, as given in this case, informed the jury that, in order to find the defendant guilty of felony murder, the State was required to prove the elements of the crime beyond a reasonable doubt, including:

1. The defendant committed the crime of armed robbery, attempt to commit armed robbery or aggravated burglary under circumstances or in a manner dangerous to human life;

2. The defendant caused the death of Jeff Villanueva during the commission of armed robbery, attempt to commit armed robbery or aggravated burglary;

. . . .

The jury was charged on attempt to commit armed robbery based on the evidence of attempted theft of cash from Villanueva's wallet, on armed robbery based on the evidence of the taking of Brazfield's keys, and on aggravated burglary based on several alternatives all arising out of the evidence of entry into Brazfield's apartment. The various alternatives combined the elements of intent to commit theft, the intent to commit murder, entry while armed with a deadly weapon, and commission of a battery while entering or leaving, into four different but similar charges.

10. The jury convicted McGruder of felony murder, aggravated burglary, armed robbery, attempted armed robbery, bribery of a witness, aggravated assault, unlawful taking of a vehicle, tampering with evidence and child abuse. The trial judge initially sentenced him to life plus twenty-seven years, but on motion to reconsider the sentence, the judge imposed the sentences for aggravated burglary, armed robbery and attempted armed robbery concurrently with the felony murder charge. On appeal, McGruder argues that he is entitled to a new trial both because he was denied a lesser included instruction on second degree murder and because of the prejudicial nature of the trial

identification arising out of the photo array. He also argues that his sentences for both unlawful taking of a motor vehicle and armed robbery violated his right to be free from double jeopardy, and he asks that we order the district court to vacate his sentence for unlawful taking. Finally, he argues that his conviction for child abuse should be reversed and the cause remanded with directions to dismiss the charge.

## II.

11. *Lesser included offense instruction on second degree murder.* In determining whether the trial court properly refused the instruction on second degree murder, we must determine whether the evidence supported a conviction for second degree murder. *Cf. State v. Reynolds,* 98 N.M. 527, 529–30, 650 P.2d 811, 813–14 (1982) (reversing conviction of first degree murder for failure to instruct on voluntary manslaughter). If the evidence would support a conviction for second degree murder, Defendant was entitled to have the jury instructed on that theory as a lesser included offense. *State v. Southerland,* 100 N.M. 591, 594, 673 P.2d 1324, 1327 (Ct.App.1983), *overruled on other grounds, State v. Orosco,* 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992). "Instructions on lesser included offenses should only be given when there is evidence that the lesser offense is the highest degree of the crime committed." *Southerland,* 100 N.M. at 596, 673 P.2d at 1329.

12. In this case, the trial court concluded that the evidence did not support a determination that second degree murder was the highest degree of offense committed. The district court believed that the issue was identity and that the evidence did not present the jury with a question on any element that distinguished felony murder from second degree murder. We agree with the trial court's conclusion.

13. In reviewing the defendant's entitlement, we "must be able to articulate an analysis the jury might have used to determine guilt, and that analysis must be reasonable." *State v. Sizemore,* 115 N.M. 753, 758, 858 P.2d 420, 425 (Ct.App.1993). Defendant

offers two scenarios by which a jury might reasonably find him guilty of second-degree murder. He argues that the evidence did not show what happened in the seconds between the time Villanueva opened the door and Brazfield heard the gunshot. Therefore, he reasons, the jury was entitled to infer that a disagreement arose, McGruder fired in anger, and McGruder then decided to take the keys to the truck in order to escape. Alternatively, he argues that the jury was entitled to infer that McGruder held the gun to Villanueva's head, intending to frighten him, and then accidentally fired. Defendant also argues that the Legislature intended that second degree murder instructions always be given in a first degree murder case because the statute states, "Murder in the second degree is a lesser included offense of the crime of murder in the first degree." NMSA 1978, § 30-2-1(B) (Repl.Pamp.1994).

■ 14. Neither of these arguments is persuasive. In *State v. Aguilar,* 117 N.M. 501, 873 P.2d 247 (1994), this Court held that instructions on second degree murder as a lesser included offense should only be given if there is a view of the evidence to support the lesser charge. *Id.,* 117 N.M. at 506, 873 P.2d at 252 (quoting *State v. Anderson,* 116 N.M. 599, 605, 866 P.2d 327, 333 (1993)). The Court cited the committee commentary to UJI 14-211 NMRA 1996 which stated that, "[A]n instruction on second degree murder should not be given when the evidence only supports murder in the first degree." *Aguilar,* 117 N.M. at 506, 873 P.2d at 252. The trial court is only required to give lesser included instructions on second degree murder if there is a plausible view that second degree murder is the highest degree of offense committed. In order to determine whether there is such a view in this case, we review the statutory language and our recent cases analyzing felony murder. *Cf. State v. Southerland,* 100 N.M. at 596, 673 P.2d at 1329 (analyzing the intent element of first and second degree murder and of aggravated battery to determine if defendant was entitled to instruction on aggravated battery as well as attempted first and second degree murder).

■ 15. By statute in New Mexico, a death caused "without lawful justification or excuse ... in the commission of or attempt to commit any felony" is first degree murder. Section 30-2-1(A)(2). We have said that "New Mexico has a distinct version of the felony-murder doctrine." *State v. Campos,* 122 N.M. 148, 153, 921 P.2d 1266, 1271 (1996). "The primary distinction between New Mexico's felony-murder doctrine and those of other jurisdictions is that, in *State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991), this Court imposed a mens rea requirement for felony murder." *Id.* The mens rea requirement is satisfied by proof of intent to kill, knowledge that one's actions create a strong probability of death or great bodily harm, or action in a manner greatly dangerous to the lives of others. *State v. Griffin,* 116 N.M. 689, 695, 866 P.2d 1156, 1162 (1993). Because of the mens rea requirement, we have concluded that in New Mexico our felony murder doctrine elevates second degree murder to first degree murder when committed in the course of a dangerous felony. *State v. Lopez,* 122 N.M. 63, 66, 920 P.2d 1017, 1020 (1996); *State v. Campos,* 122 N.M. at 154, 921 P.2d at 1272.

16. We recently limited the class of felonies on which the State may rely in charging and proving felony murder. We previously had said the offense must be a first degree felony, an inherently dangerous lesser degree felony, or a lesser degree felony committed under inherently dangerous circumstances. *See State v. Harrison,* 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977). More recently, we have also said that the felony may not be a lesser included offense of second degree murder and that, in determining what is a lesser included offense for these purposes, a "strict-elements test" is appropriate. *State v. Campos,* 122 N.M. at 155-56, 921 P.2d at 1273-74.

■ 17. Under the New Mexico version of the felony murder doctrine, then, a murder that occurs in the course of a felony may be second degree murder rather than first. That may happen, for example, if the felony at issue is not a first degree felony and does not fall within the class of lesser degree felonies that are appropriate predi-

cates or was not committed under circumstances that are inherently dangerous. A jury might be required to determine whether a murder occurred in the course of an appropriate predicate felony. In those circumstances, an instruction on both felony murder and second degree murder would be appropriate.

18. In this case, McGruder does not challenge the adequacy of the three felonies on which the State relied as predicates for the charge of felony murder. His argument also does not depend on the evidence of mens rea. Rather, his primary argument depends on whether there was evidence from which the jury might have determined that Villanueva's death was not caused "in the commission of or attempt to commit any felony." Section 30–2–1(A)(2). He argues that the murder might be viewed as separate from the theft of the truck, and thus that Villanueva's death was not caused by an attempt to take the truck, but rather, his death precipitated a course of events resulting in a taking.

19. In answering McGruder's argument, we note that the statutory language defines as felony murder a death caused not only "in the commission of" a felony but also in the "attempt to commit any felony." Section 30–2–1(A)(2). In this case the State identified two felonies that occurred at approximately the same time as Villanueva's death: the burglary that occurred almost, if not simultaneously, and the armed robbery that occurred shortly thereafter. The State proved a nexus between these two felonies and the murder that excluded the possibility the murder was not committed in the commission of a felony. As the prosecutor stated in her opening statement, this was a case about a truck that a man believed was worth murder.[1] Thus, the State's evidence excluded the possibility of an instruction on second degree murder.

20. The evidence that McGruder expressed interest in the truck and test-drove it earlier in the day, and his subsequent rejection of the keys to Villanueva's car, are strong indications that the decision to take the truck led McGruder to murder. Brazfield testified that only a few seconds elapsed between the time she heard the knock at the door and the time she heard the shot, allowing little or no time for an argument to arise. A detective testified that McGruder's pistol was defective and required that a part be moved manually before the trigger was pulled and the gun fired. This precludes any inference that McGruder discharged the gun accidentally, and then used the truck to escape.

21. Because the facts do not support the inferences on which McGruder's argument depends, we do not address the further question of whether, had the facts supported those inferences, the proper lesser included instruction would have been voluntary manslaughter rather than second degree murder. *See* NMSA 1978, § 30–2–3(A) (Repl. Pamp.1994). "Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion." *Id.* "[A] negligent or accidental killing would not constitute second degree murder and would therefore not implicate the felony-murder doctrine." *State v. Campos*, 122 N.M. at 154, 921 P.2d at 1272. The trial court did not err in rejecting an instruction on second degree murder. There is no evidence that McGruder killed Villanueva in a manner other than in the commission of one or more felonies and with the requisite mens rea. We affirm the trial court's decision to deny an instruction on a lesser included offense of murder.

## III.

22. *Double jeopardy.* Defendant argues that his convictions for armed robbery and unlawful taking of a motor vehicle violate his right to be free from double jeopardy. We use the established, two-pronged *Swafford* test to analyze double jeopardy claims. *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991). Under the first prong, we ask whether the defendant's conduct was unitary. If the conduct is unitary, then the second inquiry applies, asking

---

1. "Picture in your mind, if you will, a black shiny, 1988 Nissan pickup truck. This truck has fancy pinstripes down the side. It has special wheels and all the trimmings. This is a case about a pickup truck that was worth killing for to this Defendant."

whether the Legislature intended to impose multiple punishments for the unitary conduct in question. *Id.*

23. In determining whether conduct is unitary, we have suggested several dispositive inquiries. We said, for example, that when time and space sufficiently separate relevant events, "[c]onduct is separate and distinct and not unitary." *State v. Contreras,* 120 N.M. 486, 490, 903 P.2d 228, 232 (1995) (citing *Swafford,* 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991)). We have also said that the quality or nature of particular acts and the objects or results of those acts may be distinguishable and thus show non-unitary conduct. *Id.* (citing *Swafford,* 112 N.M. at 14, 810 P.2d at 1234).

24. The State argues that the conduct was not unitary, urging this Court to hold that the armed robbery comprised of the taking of the keys, and the unlawful taking of the motor vehicle occurred when McGruder actually drove the truck away. There is support for this view in the law of other jurisdictions. *See Hagan v. State,* 836 S.W.2d 459 (Mo.1992) (en banc). "Stealing the motor vehicle and stealing the vehicle's keys *by force* involve, as we have said, two distinct items of property and two distinct kinds of conduct." *Id.* at 463 (emphasis added). There is also support for the opposite result, on a different rationale. *See People v. Rush,* 16 Cal.App.4th 20, 20 Cal.Rptr.2d 15 (1993).

> [T]he evidence at the preliminary hearing and at trial unequivocally established that the automobile was part of the loot stolen in the robbery. Here, the specific language of the pleadings alleged the automobile theft as a lesser, necessarily included offense within the charged robbery because the offenses involved the same victim on the same date. It appears settled that "[a] defendant commits only one robbery no matter how many items he steals from a single victim pursuant to a single plan or intent."

*Id.* 20 Cal.Rptr.2d at 19 (quoting *People v. Brito,* 232 Cal.App.3d 316, 283 Cal.Rptr. 441, 447 (1991)).

25. The evidence does not indicate McGruder took the set of keys for its intrin-sic value. Rather, he took the keys in order to be able to operate the truck. That interpretation of the evidence is supported by McGruder's rejection of Villanueva's car keys and firm insistence on locating the truck keys. McGruder's determination to obtain the truck keys was undoubtedly motivated by his desire to operate the truck in order to steal it. There was no evidence that the object of taking the keys served any purpose other than furthering and completing the goal of stealing the truck. *Cf. State v. Lopez,* 122 N.M. at 70, 920 P.2d at 1024 (finding unitary conduct in felony murder and attempted armed robbery where there was "no evidence that the object of the shooting served any purpose other than furthering the predicate felony [of attempted robbery] and assisting in its completion"); *Contreras,* 120 N.M. at 490, 903 P.2d at 232 (finding unitary conduct in felony murder and armed robbery based on acts of stabbing victim-cabdriver and then taking the cab and its contents).

26. However, the keys had value to Brazfield, who would have had to replace them, and they were of value to McGruder, who was able to take the truck with less difficulty than he would have had without them. NMSA 1978, § 30–16–2 (Repl.Pamp.1994) ("Robbery consists of the theft of anything of value...."). Further, the two acts were separated by time and space because McGruder spent some time in threatening Brazfield and in finding Villanueva's wallet inside the apartment before going outside to the parking lot. On these facts, we conclude that McGruder's act in taking the keys and in driving away the truck did not constitute unitary conduct within the meaning of our double jeopardy jurisprudence. *Cf. People v. Green,* 50 Cal.App.4th 1076, 58 Cal.Rptr.2d 259, 263 (1996) (affirming multiple convictions for both carjacking, under a specific statute, and robbery, because taking of car and taking of purse were separated in time and place).

27. Because we think the question of whether the conduct was unitary is close, we turn to the second prong, i.e., whether the Legislature intended multiple punishments for the unitary conduct. The Legislature did not expressly provide for multiple punish-

ments in a case such as this one. *Swafford,* 112 N.M. at 14, 810 P.2d at 1234. Therefore, we next ask whether each statute requires proof of a fact that the other does not. *Id.* (adopting the elements test articulated by the United States Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). If "one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes...." *Swafford,* 112 N.M. at 14, 810 P.2d at 1234. We scrutinize both statutes to determine whether one is subsumed within the other. The elements comprising our armed robbery statute include: asportation of property, from the victim or from his immediate control, intending to permanently deprive him of the property, while armed with a weapon, or with force or violence, or threat thereof. *See* § 30–16–2; UJI 14–1621 NMRA 1997. The crime of an unlawful taking of a motor vehicle consists of: taking a vehicle without the owner's consent and with criminal intent. *See* NMSA 1978, § 66–3–504 (Repl. Pamp.1994); *State v. Austin,* 80 N.M. 748, 461 P.2d 230 (Ct.App.1969) (requiring criminal intent for the crime of unlawful taking of a motor vehicle). We conclude the unlawful taking statute does require proof of an additional element absent in the robbery statute; that additional element is the taking of a motor vehicle. We also conclude that the robbery statute requires proof of elements not present in the unlawful taking statute; the additional elements are a taking by force and an intent to permanently deprive the victim of his or her property.

28. The overlap between the two existing statutes arises only when one considers the particular facts of this case. However, we have abandoned the fact-based test in double jeopardy multiple punishment analysis. *See State v. Fuentes,* 119 N.M. 104, 106–07, 888 P.2d 986, 988–89 (Ct.App.1994) (discussing the fact-based test of *State v. DeMary,* 99 N.M. 177, 655 P.2d 1021 (1982), and noting it has been restricted by *Swafford v. State* to the propriety of instructions on lesser included offenses).

29. Under these circumstances, where one statute is not subsumed within the other, there is a presumption that the Legislature did intend to punish wrongdoers of both offenses separately. *Swafford v. State,* 112 N.M. at 14, 810 P.2d at 1234. That presumption is not conclusive and may be rebutted. *Id.* It has not been rebutted in this case.

30. To assist in determining whether multiple punishment is proper in this case, we examine the interests which the two statutes protect and the behavior each seeks to deter. Armed robbery primarily protects property. *State v. Fuentes,* 119 N.M. at 108, 888 P.2d at 990. However, it also punishes the use of force and protects persons. *See generally State v. Curley,* 123 N.M. 295, 939 P.2d 1103 (Ct.App.1997) (discussing *Fuentes* and noting that the crime of robbery is directed at protecting both persons and property). In fact, the Legislature punishes a second robbery offense more severely than a first. A first offense is punishable as a second degree felony; a second and subsequent offenses are punishable as first degree felonies. Section 30–16–2. Unlawful taking of a vehicle is punishable as a fourth degree felony under the Motor Vehicle Code. NMSA 1978, § 66–8–9 (Repl.Pamp.1994). There is an exception for the holder of a duly recorded lien where the lienholder is entitled to possession. *See* Section 66–3–504(C). Unlawful taking of a vehicle primarily protects an owner's right to immediate possession of an automobile. *See generally State v. Eckles,* 79 N.M. 138, 441 P.2d 36 (1968) (holding conviction of unlawful taking does not require proof of intent to permanently deprive owner of possession).

31. We conclude the Legislature has established crimes with significantly different purposes. The lesser penalty assigned to unlawful taking of a vehicle and its inclusion within the Motor Vehicle Code rather than the more general statutes defining crimes support a determination that the crime of unlawful taking protects possessory rights in a specific kind of property. The self-enhancement contained in the armed robbery statute and the high penalty assigned in general to robbery support a determination that the Legislature intended to protect not only property in general, but also persons against the use of force or the threat of force. Both

involve a taking, and taking the keys to a truck by force and then driving the vehicle away might be an event that the Legislature could choose to punish by a specific statute prohibiting conduct sometimes described as "carjacking." However, our legislature has not created such a crime.

32. Further, the penalty for each of the two offenses is not disproportionate with the fact of independent punishments. Unlike the felony murder statute at issue in both *Lopez* and *Contreras*, there is no indication that one statute is a base statute and the other an aggravated form of the base offense. *Cf. State v. Pisio*, 119 N.M. 252, 261–62, 889 P.2d 860, 869–70 (double jeopardy principles articulated in *Swafford v. State* precluded multiple punishment for both criminal sexual penetration in the second degree and kidnapping, when kidnapping is the felony enhancing the base offense and the conduct is unitary).

33. We conclude that McGruder's acts of taking the truck keys and then using those keys to drive the truck away support separate convictions for purposes of sentencing. McGruder's double jeopardy right to be free from multiple punishment is not violated by his sentence for unlawful taking. Hence, we affirm the conviction for unlawful taking of a vehicle.

### IV.

34. *Prior identification.* In order to determine whether an identification is impermissible, a two-part test applies. We must analyze whether the photo array was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and, if so, "under the totality of the circumstances," whether the identification is nonetheless reliable. *State v. Clark*, 104 N.M. 434, 439, 722 P.2d 685, 690 (Ct.App.1986). In this case, Brazfield was shown a photo array which consisted of six photos of African–American males of about the same facial proportions, age, and hair length. However, only one of the photographs showed a man with braided hair, who also had a lighter skin tone than the others. McGruder argues that these two factors were impermissibly suggestive.

35. Given the totality of the circumstances of this case, we disagree. Brazfield had more than sufficient time and had numerous opportunities to observe McGruder both before and after the test drive and also during the commission of the crimes. When McGruder knocked at Brazfield's apartment, she inquired as to who was at the door, and Villanueva's answer indicated he identified McGruder. After hearing the first gunshot, Brazfield had a significant amount of time to recognize the man with the gun as the same man who had test-driven the truck. McGruder appeared before Brazfield in the bedroom, and he subsequently followed her around the apartment while she searched for the truck keys. Brazfield watched McGruder linger at Villanueva's body and remove his wallet. When the detective brought her the photo array, she identified McGruder immediately, and she had a strong emotional response to seeing his picture.

36. Under the totality of these circumstances, we may reasonably conclude that the trial court did not err in allowing Brazfield to identify McGruder. Her identification was admissible because, given these circumstances, she had more than ample time to observe McGruder which made her later identification, both from the photo array and in court, inherently reliable.

### V.

37. *Child abuse.* McGruder was convicted of child abuse negligently caused, without great bodily injury. *See* NMSA 1978, § 30–6–1(C) (Repl.Pamp.1994). The statute provides: "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be … placed in a situation that may endanger the child's life or health." *Id.* There must be " 'a reasonable probability or possibility' that the child will be endangered." *State v. Ungarten*, 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct.App.1993) (citation omitted). "Whoever commits abuse of a child which does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony…." Section 30–16–1(C).

38. We view the evidence in the light most favorable to the verdict. *State v. Garcia*, 114 N.M. 269, 273, 837 P.2d 862, 866 (1992). McGruder aimed a gun at Brazfield and threatened to kill her while her daughter was standing behind her, and he followed Brazfield around the apartment with the gun while she searched for the truck keys. The child cried throughout the ordeal. McGruder twice placed the gun to Brazfield's temple and threatened her. The jury was entitled to view such conduct as endangering either the life or health of the child. We therefore hold that substantial evidence existed to support McGruder's conviction on this charge, and we affirm the conviction of the child abuse charge.

## VI.

39. *Conclusion.* For the foregoing reasons, we hold that McGruder is not entitled to a new trial. The court did not err in denying the request for an instruction on second degree murder nor in allowing Brazfield to identify McGruder at trial. We conclude there is sufficient evidence to support the conviction for child abuse. We also conclude that sentences for both armed robbery and unlawful taking of a vehicle do not violate double jeopardy principles. We affirm.

40. **IT IS SO ORDERED.**

BACA and SERNA, JJ., concur.

FRANCHINI, C.J., concurring in part and dissenting in part.

FRANCHINI, Chief Justice, concurring in part, dissenting in part.

41. I concur in parts I, II, IV and V. I do not concur in part III and that portion of part VI that allows sentencing for both armed robbery and unlawful taking of the vehicle. In my view, the actions of defendant were clearly *unitary.* There is no difference between asportation of property on the one hand and unlawful taking of a vehicle *which is* property on the other. Armed robbery of the keys to the truck resulted in the unlawful taking of the truck. Virtually no time elapsed between these actions. I would vacate the sentence for unlawful taking of a

vehicle in part IV and affirm the remainder of the case in toto.