This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:  October 5, 2017**

**NO. S-1-SC-35780**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**MARK R. ROMERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
George P. Eichwald, District Judge

McGarry Law Office
Kathleen A. McGarry
Glorieta, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

{1}    Mark Romero (Defendant) appeals his convictions of false imprisonment, contrary to NMSA 1978, Section 30-4-3 (1963); felony murder, contrary to NMSA 1978, Section 30-2-1(A)(2) (1994); and kidnapping, contrary to NMSA 1978, Section 30-4-1(B) (2004). The trial court vacated the kidnapping conviction, the predicate offense underlying the felony murder conviction. *State v. Frazier*, 2007-NMSC-032, ¶¶ 1, 40, 142 N.M. 120, 164 P.3d 1 (holding that, for double jeopardy purposes, "the predicate [offense] is always subsumed into a felony murder conviction"). We have jurisdiction over the appeal pursuant to Rule 12-102(A)(1) NMRA.

{2}    Defendant contends that the evidence was insufficient to support the convictions and that the trial court abused its discretion during the direct examination of a witness, Dennis Chavez (Chavez), who was present during the false imprisonment. We reject these arguments. Because the issues are well-settled under New Mexico law, we render a non-precedential decision affirming the convictions. *See* Rule 12-405(B) NMRA.

**I.    BACKGROUND**

{3}    Defendant and his wife lived next door to Genevieve Jaramillo (Jaramillo) at

an apartment complex in Bernalillo, New Mexico. On the evening of July 30, 2011, Genevieve Jaramillo was inside her apartment with Chavez and her boyfriend, Francisco Landovazo (Victim). Chavez and Jaramillo had been visiting for several hours.

{4}     Suddenly, Defendant and Freddie Silva (Silva) entered Jaramillo's apartment, held a gun to her head, and told Jaramillo and Chavez to get on the floor. Defendant handcuffed Victim and told him to get into the back of a truck. Defendant then drove Victim to El Llanito, New Mexico.

{5}     When they arrived in El Llanito, Victim was still in the truck. Defendant and Silva discussed what to do next. Defendant started beating Victim with a baseball bat, hitting Victim about five times. Silva warned Defendant that "[he was] going to get blood everywhere." According to Silva, "nothing was ever supposed to go that far."

{6}     Defendant asked Silva for a "rope or something." Defendant retrieved a rope from a nearby shed, wrapped it around Victim's neck, and began to "choke" Victim. Silva testified that Defendant continued to strangle Victim for roughly a minute, "until he stopped moving." Victim died "when [Defendant] choked him." Defendant then tied Victim up with a rope. Defendant later bragged about the killing to a corrections officer, and told the officer that "if [Silva] would have kept his mouth shut, they both

3

would have got[ten] away with it."

**{7}** Victim's body was discovered in a remote location near Highway 550, hogtied and bound in five different ways. The location of the body was consistent with Silva's testimony that, after the murder, he, Defendant, and Defendant's wife drove west on Highway 550 "to find somewhere to get rid of the body." Security footage from the Giant in San Ysidro depicts three vehicles entering the property at 3:42 a.m. The security footage depicts Defendant's wife exiting her car, messing with a gas pump, and getting back into the vehicle.

**{8}** Silva testified that Defendant placed the body into the trunk of his wife's car. The carpet lining was later found to be missing from her car's trunk. An expert testified that "normally[,] that trunk lining is attached to the trunk floor."

**{9}** The State introduced expert testimony that, on the night of the killing, there were six or seven calls between Defendant's wife's cell phone and a phone subscribed to Silva's daughter.[1] Both phones were in Bernalillo before going "off the grid," and "could have been in the same area." Additional facts are included as relevant to the analysis.

---

[1]The expert witness, Russell Romero (Agent Romero), is a Special Agent for the Federal Bureau of Investigation trained to approximate cell phone locations. The State moved to qualify Agent Romero as an expert and Defendant did not object.

4

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

{10} "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence . . . to the contrary." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "[O]ur review never serves as a substitution for the jury's fact-finding role." *State v. Tafoya*, 2012-NMSC-030, ¶ 36, 285 P.3d 604. However, "[i]t is our duty to determine whether a jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *State v. Consaul*, 2014-NMSC-030, ¶ 42, 332 P.3d 850 (internal quotation marks and citation omitted).

### B. Evidence Supporting the False Imprisonment Conviction

{11} "False imprisonment consists of intentionally confining or restraining another person without his [or her] consent and with knowledge that he [or she] has no lawful authority to do so." Section 30-4-3. To convict Defendant of false imprisonment, the jury was instructed to find that (1) Defendant restrained and/or confined Jaramillo against her will; (2) Defendant knew he had no authority to restrain or confine Jaramillo; and (3) this happened in New Mexico on or about July 30, 2011. *See* UJI

14-401 NMRA. Silva testified that the incident occurred on July 30, 2011.

**{12}** We begin with the evidence supporting the restraint element. The jury could have found that Defendant restrained or confined Jaramillo against her will based on testimony that he grabbed her by the hair, held a gun to her head, and told her to get to the ground. *See State v. Corneau*, 1989-NMCA-040, ¶¶ 12-14, 109 N.M. 81, 781 P.2d 1159 (holding that the restraint may rise "out of words, acts, gestures, or similar means," and need only last a brief time), *cert. denied*, *Corneau v. State*, 108 N.M. 668, 777 P.2d 907 (May 16, 1989). Defendant dragged Jaramillo across the room, an action we have upheld as sufficient to support the restraint element. *Id.* Jaramillo was shaking and crying and there was testimony that she, Chavez, and Victim were not free to leave. This evidence was clearly enough for a jury to find that Defendant restrained Jaramillo against her will.

**{13}** Next, we review the evidence that Defendant knew that he had no authority to restrain Jaramillo. "[W]hen a defendant's underlying acts are unlawful, it may be inferred that the defendant knows, too, that he has no lawful authority to restrain the victim in the commission of those unlawful acts." *State v. Barrera*, 2002-NMCA-098, ¶ 11, 132 N.M. 707, 54 P.3d 548. Defendant restrained Jaramillo in the commission of a violent kidnapping and murder. Defendant did so by holding a gun to Jaramillo's

6

head and dragging her by the hair, acts which could constitute assault or battery. *See* NMSA 1978, § 30-3-1(B) (1963) (defining assault as "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery"); *see also* NMSA 1978, § 30-3-4 (1963) ("Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner."). Based on the unlawful circumstances of the restraint, the jury could have found that Defendant knew he lacked the authority to restrain Jaramillo.

**{14}** We reject Defendant's contention that it was Silva who imprisoned Jaramillo, and the evidence was therefore insufficient to support the false imprisonment conviction. Independent of Silva's actions, Defendant's dragging Jaramillo across the room with a gun to her head was sufficient to constitute false imprisonment. Moreover, we have upheld convictions where the defendant was one of multiple perpetrators. *See, e.g.*, *State v. Smith*, 2001-NMSC-004, ¶¶ 4-5, 10, 130 N.M. 117, 19 P.3d 254. For example, in *Smith*, the defendant and two others shoved a stranger in a car and drove him to a remote location. *Id.* ¶ 5. We held that the jury could have reasonably determined that the defendant either confined the victim against his will or helped or encouraged that to happen. *Id.* ¶ 10; *see also State v. Muise*,

7

1985-NMCA-090, ¶¶ 28-30, 103 N.M. 382, 707 P.2d 1192 (upholding a conviction of false imprisonment when the defendant and her son acted together to halt and disable a school bus), *cert. denied*, *Muise v. State*, 103 N.M. 287, 705 P. 2d 1138 (1985). In sum, there was sufficient evidence to uphold the false imprisonment conviction in this case.

**C.      Evidence Supporting the Felony Murder Conviction**

{15}     A felony murder conviction requires proof that (1) the defendant committed or attempted to commit a felony, of either the first degree or under circumstances or in a manner dangerous to human life; (2) "the defendant caused the death of the victim during the commission or attempted commission of the felony"; (3) "the defendant intended to kill or knew that his or her acts created a strong probability of death or great bodily harm." *See State v. Marquez*, 2016-NMSC-025, ¶ 13, 376 P.3d 815.

**1.      Evidence supporting the predicate offense, kidnapping**

{16}     Defendant was charged with felony murder based on the predicate offense of first-degree kidnapping. "Kidnapping is the unlawful taking, restraining, transporting or confining of a person[] by force, intimidation[,] or deception, with intent . . . to inflict death, physical injury[,] or a sexual offense on the victim." Section 30-4-1(A). To convict Defendant of kidnapping, the jury was instructed to find that (1) Defendant

8

took, restrained, or transported Victim by force; (2) intended to hold Victim against his will, to inflict death or physical injury; and (3) this happened in New Mexico on or about July 30, 2011. *See* UJI 14-403 NMRA.

{17}    We begin with the evidence that Defendant took, restrained, or transported Victim by force. "[T]he key to finding the restraint element in kidnapping . . . is to determine the point at which the physical association . . . was no longer voluntary." *State v. Jacobs*, 2000-NMSC-026, ¶ 24, 129 N.M. 448, 10 P.3d 127. Here, Defendant handcuffed Victim, told Victim to get in Defendant's truck, and drove Victim to El Llanito. The cell phones were in El Llanito during the relevant time frame. In addition, a reasonable mind could have inferred that the taking was forceful because Defendant was armed and caused Victim to yell and scream. Defendant did not protest when Silva punched Victim. In total, this evidence was sufficient to find that Defendant took, restrained, or transported Victim by force.

{18}    With respect to Defendant's intent to hold Victim against his will, "it is the intent of [the] defendant which controls, and the determination as to whether this intent was present is for the trier of the facts when [at] issue in the case." *State v. Aguirre*, 1972-NMSC-081, ¶ 35, 84 N.M. 376, 503 P.2d 1154. The jury found that Defendant had the requisite intent. Its finding was supported by the fact that

9

Defendant initiated a plan to confront Victim, forced him into his truck, told Victim they would "take him and talk to him," and subsequently killed him.

**2.      Evidence that Defendant caused the death of Victim**

{19}      Next, we review the evidence of a causal relationship between the death and the felony. *See State v. Harrison*, 1977-NMSC-038, ¶¶ 10-11, 90 N.M. 439, 564 P.2d 1321, *superseded on other grounds as stated in Tafoya v. Baca*, 1985-NMSC-067, ¶ 17, 103 N.M. 56, 702 P.2d 1001. The death must be caused by "those acts of [the] defendant or his accomplice initiating and leading to the homicide without an independent force intervening." *Harrison*, 1977-NMSC-038, ¶ 11. In this case, there was ample evidence that Victim died as a result of Defendant's acts. Silva testified that Victim died when Defendant "choked" him with a rope. The doctor who performed the autopsy confirmed that Victim died as a result of strangulation and four-point restraint. Together, this evidence was sufficient to support the finding that Victim died as a result of Defendant's actions.

{20}      Defendant contends that the State failed to prove that he "personally" killed Victim. We disagree. The jury was free to reject this version of events. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to

10

reject [the d]efendant's version of the facts."). Moreover, Defendant overlooks that he could be liable for the acts of a person with whom he shares a common plan. *See Harrison*, 1977-NMSC-038, ¶ 11 ("[C]ausation consists of those acts of [the] defendant or his accomplice initiating and leading to the homicide."); *see also State v. O'Kelly*, 2004-NMCA-013, ¶ 45, 135 N.M. 40, 84 P.3d 88 (assuming that a defendant could be liable for felony murder when the killer was an accomplice). Because there was sufficient evidence that Defendant caused the death of Victim, this argument fails.

### 3.        Evidence of Defendant's intent to kill

{21}     Finally, we review the evidence that Defendant had the intent to kill. *State v. Ortega*, 1991-NMSC-084, ¶ 25, 112 N.M. 554, 817 P.2d 1196 (limiting the scope of felony murder liability to intentional killings), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶¶ 17-18, 148 N.M. 381, 237 P.3d 683. To sustain a felony murder conviction, the State must prove that Defendant possessed, at a minimum, the mens rea required to sustain a conviction of second-degree murder, "knowledge that the defendant's acts create a strong probability of death or great bodily harm." *Ortega*, 1991-NMSC-084, *¶* 25 (internal quotation marks and citation omitted); *see also* § 30-2-1(B) (identifying the mens rea for second-degree murder).

11

**{22}** In this case, there was ample evidence that the killing was intentional. *Cf. State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515 ("Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence."). Prior to the strangulation, Silva and Defendant "said a few words more or less deciding what [they] were going to do." They paused to retrieve a rope. *Cf. State v. Gonzales*, No. 35,291, dec. ¶ 4 (N.M. Sup. Ct. Feb. 11, 2016) (non-precedential) (construing the defendant's retrieval and preparation of a weapon as evidence of deliberate intent). Defendant then wrapped the rope around Victim's neck and strangled him until he stopped moving. Defendant held the rope around Victim's neck for about a minute, enough time for Defendant to realize that his actions posed a great risk of harm.

**{23}** The method of killing, strangulation, gives rise to an inference that Defendant had the intent to kill. *Cf. State v. Smith*, 2016-NMSC-007, ¶ 22, 367 P.3d 420 (noting that a prolonged method of killing raises an inference of deliberate intent). In addition, Victim's body was discovered with a long, yellow rope around the neck, wrists, and ankles; a white rope and coaxial cable around the neck; and a black and white scarf around the ankles. The numerous and complicated bindings were evidence of overkill, i.e., excessive injury. *Cf. Smith*, 2016-NMSC-007, ¶ 22 (describing numerous stab

12

wounds as evidence of overkill and deliberation). Defendant later "bragged" to a corrections officer about the killing and hoped to get away with the charges. The jury could have interpreted these statements as evidence that the killing was intentional. *Cf. Duran*, 2006-NMSC-035, ¶ 9 (holding that the jury could have interpreted the defendant's attitude toward the deceased as evidence of deliberation). Based on this evidence, a reasonable mind could have found that Defendant not only knew that his actions created a probability of death but deliberately killed Victim.

{24}     In sum, the State proved the elements of the predicate offense, kidnapping; a causal relationship between the kidnapping and death; and that the killing was intentional. *See Marquez*, 2016-NMSC-025, ¶ 13 (describing the elements necessary to sustain a felony murder conviction). This was sufficient evidence to support the felony murder conviction.

**III.     IMPEACHMENT OF DENNIS CHAVEZ**

{25}     Last, Defendant argues that the trial court abused its discretion during the direct examination of Chavez. Specifically, Defendant argues (1) it was error for the trial court to permit the use of leading questions on its own witness; and (2) the trial court erred by allowing Chavez to read from his prior statement in refreshing recollection. We conclude that it was within the trial court's discretion to allow the examination to

13

proceed in this manner.

**A.    Standard of Review**

{26}    We review the trial court's decision to admit evidence for abuse of discretion. *State v. Macias*, 2009-NMSC-028, ¶ 16, 146 N.M. 378, 210 P.3d 804, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. "A trial court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *Macias*, 2009-NMSC-028, ¶ 16 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Sutphin*, 1988-NMSC-031, ¶ 18, 107 N.M. 126, 753 P.2d 1314 (citation omitted).

**B.    Manner of Questioning**

{27}    During his direct examination, Chavez repeatedly stated that he could not remember the details of the incident and gave contradictory statements regarding key facts of the case. For example, Chavez initially denied that he had ever been to the apartments and claimed that he and Jaramillo were free to go during the false imprisonment. Chavez later testified that he was at the apartments during the false imprisonment and that he was not free to leave.

{28}    Defense counsel objected to the use of leading questions. The trial court noted

14

that Chavez was not answering the questions and declared him to be hostile, thus permitting the use of leading questions. In addition, the State sought to "refresh" Chavez' recollection using the prior statement Chavez gave to Lieutenant Mills.

{29} The trial court noted that Defendant was giving Chavez "a pretty good stare down" during the questioning and appeared to be nodding in approval of Chavez' testimony. Chavez claimed that his memory of the incident was adversely affected by drug and alcohol use and subsequent psychiatric treatment.

## C. The Trial Court Did Not Abuse its Discretion by Permitting the Use of Leading Questions

{30} Under Rule 11-611(C) NMRA, leading questions may be used on direct examination when necessary to develop the witness's testimony. *See State v. Orona*, 1979-NMSC-011, ¶¶ 28, 30, 92 N.M. 450, 589 P.2d 1041 (noting that the use of leading questions may be appropriate on direct examination when a witness is immature, timid, or frightened).

{31} The trial court's permitting the use of leading questions was not clearly against the facts and circumstances of the case. *See Sutphin*, 1988-NMSC-031, ¶ 18 (defining an abuse of discretion). The trial court acknowledged that Defendant was staring menacingly at Chavez. In addition, the trial court heard testimony that Jaramillo was unwilling to appear and that Defendant threatened to kill Silva's girlfriend in

15

retaliation for his testimony. The trial court could have reasonably permitted the use of leading questions if it determined that Chavez was frightened or intimidated. *Orona*, 1979-NMSC-011, ¶ 28. Under these facts and circumstances, the trial court did not abuse its discretion in permitting the use of leading questions.

**D.      The Trial Court Could Have Reasonably Permitted the Witness to Read from the Prior Statement for Impeachment Purposes**

**{32}**      The trial court could have reasonably permitted the witness to read from his prior statement for impeachment purposes. *See State v. Martinez*, 1982-NMCA-053, ¶ 8, 98 N.M. 27, 644 P.2d 541 (noting that a party could have introduced evidence of an inconsistency under Rule 613(b) when a witness claimed she could not remember the alleged inconsistency). Rule 11-613(B) NMRA permits a party to impeach a witness with extrinsic evidence of the witness's prior inconsistent statement when the witness has the opportunity to explain or deny the statement and is subject to cross examination. *See, e.g.*, *State v. Dominguez*, 2007-NMSC-060, ¶¶ 18-19, 142 N.M. 811, 171 P.3d 750, *holding modified on other grounds by State v. Garcia*, 2011-NMSC-003, ¶ 22, 149 N.M. 185, 246 P.3d 1057. In *Dominguez*, for example, the defendant argued that the trial court erred by permitting the impeachment without establishing the time, place, and circumstances that the statement was made. *Id.* ¶¶ 15-17. We rejected the defendant's argument, holding that such formalities are not

16

required when "the witness [has] an opportunity to explain and the opposite party an opportunity to examine on the statement, with no specification of any particular time or sequence." *Id.* ¶¶ 18-19 (internal quotation marks and citation omitted).

{33}    Both of those conditions were met in this case. Chavez was subject to cross examination and had ample opportunity to clarify his testimony. Given the numerous inconsistencies in Chavez' testimony, the trial court could have reasonably permitted the use of the statement for impeachment. *See Martinez*, 1982-NMCA-053, ¶ 8 ("Once the [witness] testified she did not remember the alleged inconsistent answer, [opposing counsel] could have introduced evidence of an inconsistency pursuant to Evidence Rule 613(b)."). It was within the trial court's discretion to determine that use of the statement was appropriate to impeach Chavez' frequent claims that he could not remember the incident. *See id.*

{34}    We acknowledge that there may have been some confusion regarding whether the statement was used to impeach or refresh recollection. The trial court, however, could have permitted impeachment without regard to the sequence of questioning. *See Dominguez*, 2007-NMSC-060, ¶¶ 15-19 (rejecting the argument that the trial court abused its discretion by permitting the State to read prior statements into evidence "without first asking questions and then using the transcript to impeach"). It was not

an abuse of discretion to allow the examination to proceed in this manner. *See id.* ¶ 19.

## IV. CONCLUSION

{35} We conclude that there was sufficient evidence to uphold Defendant's convictions, and reject Defendant's contention that the trial court abused its discretion during the questioning of a witness. We therefore affirm.

{36} **IT IS SO ORDERED.**


_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**