This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37844**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**SANDRA QUICK,**

      Defendant-Appellant.

and

**No. A-1-CA-37876**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**ALLEN QUICK,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Angie K. Schneider, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John J. Woykovsky, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM

MJ Edge, Assistant Appellate Defender
Albuquerque, NM

for Appellant Sandra Quick

Stalter Law LLC
Kenneth H. Stalter
Albuquerque, NM

for Appellant Allen Quick

**MEMORANDUM OPINION**

**B. ZAMORA, Judge.**

**{1}** Defendants[1] Sandra Quick and Allen Quick appeal following convictions of six counts of child abuse by endangerment, contrary to NMSA 1978, Section 30-6-1(D)(1) (2009). Defendants argue that there was insufficient evidence to support their convictions for child abuse. Defendant Allen Quick also appeals his convictions of eight counts of extreme animal cruelty, contrary to NMSA 1978, Section 30-18-1(B) (2007), and twenty-two counts of animal cruelty, contrary to Section 30-18-1(E), arguing that his multiple convictions for animal cruelty violate the prohibition against double jeopardy. We reverse Defendants' child abuse convictions, but otherwise affirm.

**BACKGROUND**

**{2}** In December 2015, Defendants were living in a recreational vehicle (RV) on a forty-two-acre lot near the outskirts of Tularosa in Otero County, New Mexico with a relative named Ryan Boggs and their six children (Children), who ranged in age from two to ten years old. On December 5, 2015, Deputy Lee Wilder of the Otero County Sheriff's Department was dispatched to Defendants' property to perform a welfare check on Children. Upon arrival at the property, Deputy Wilder scanned the area for potential dangers to Children's safety and photographed the various conditions on the property he observed. Deputy Wilder met Defendants Allen Quick and Sandra Quick, who he described as "dirty" and emitting a foul odor as if they "hadn't bathed in some time." After meeting Defendants, Deputy Wilder continued to investigate the property where he observed a large, uncovered, excavated trash pit and expressed concern because of the presence of a child's bicycle in close proximity. In addition, Deputy Wilder observed an abundance of debris including trash, building supplies, clothing, children's toys, housing goods, and various other items scattered around the RV. Deputy Wilder also witnessed a large amount of animal feces near the RV. Defendant Sandra Quick later informed Deputy Wilder that there were twenty-two dogs and eight cats on the property.

---

[1]Although Defendants appeal separately, we consolidate these cases for decision because both Defendants raise similar issues, and because both Defendants were codefendants at the child abuse trial. *See* Rule 12-317(B) NMRA.

**{3}**     After Deputy Wilder completed his investigation of the exterior of Defendants' property, Defendants permitted Deputy Wilder to examine the interior of the RV. Deputy Wilder described the smell inside the RV as "shocking." He testified that when the door opened, "It was like a wall hit you. I recognized some of the odors—feces, odor of urine, body odor—and it was all mixed into one." All Children were inside the RV when he entered. The interior of the RV was dirty and in disarray. Defendants' toilet contained unflushed feces, and the floor of the RV was strewn with trash, blankets, bedding, and various other debris. Deputy Wilder observed several broken windows in the RV that were covered with cardboard or paper and testified he "[could] hear the wind whistling through." There were bugs and animal food in the sink, and Deputy Wilder testified that a foul odor emanated from the refrigerator, indicating the presence of spoiled food. Although most of the animals lived outside, some of the dogs and cats resided inside the RV. Deputy Wilder asked Defendant Allen Quick about the lack of water in the toilet, to which Defendant Allen Quick replied that "they would pump water in every now and then to flush out the system" using a 300-gallon water tank stored outside the RV. Deputy Wilder noted that there was still water in the container at the time, and Defendant Allen Quick stated he would fill up the 300-gallon tank when it became empty. The State's photographic evidence showed that Children lived in close proximity to the conditions documented by Deputy Wilder.

**{4}**     Based on the conditions Deputy Wilder observed during his investigation of Defendants' property, Deputy Wilder believed that Children were in danger. Accordingly, Deputy Wilder removed Children from the property, and transferred them into CYFD custody. Annette Munguia, the on-call caseworker for CYFD, made contact with Children at the Otero County Sheriff's Office following their removal from the property and transfer to CYFD custody. Munguia testified that "the two younger ones didn't have shoes or socks on" and Children "were all dirty, very dirty."

**{5}**     During trial, the prosecution presented expert testimony from Dr. Jana Williams, a board-certified pediatrician, detailing the potential health risks posed by the various conditions existing on Defendants' property. Dr. Williams testified that the large trash pit near the RV, the bug spray stored in a container that looked like a milk jug, as well as the spoiled food inside the RV, presented "safety concern[s]." Dr. Williams had previously treated children that were injured playing near garbage piles and testified that exposure to fecal matter and spoiled food can cause outbreaks of salmonella, clostridium difficile, or Escherichia coli (E. Coli). Concerning E. Coli, Dr. Williams stated it "can make kids really sick and shut down their kidneys." Dr. Williams also testified that Children were all underweight. The three eldest Children were in the fifth percentile in weight for children their age, and the three youngest Children were in the twenty-fifth percentile in weight for children their age. Based on her review of school records from 2009 to 2017, Dr. Williams concluded that Children had "expressive language delays, so their ability to communicate was delayed compared to other children their age."

**{6}**     After the child abuse trial, a jury convicted Defendants on all six counts, and two months later Defendants pled no contest to the animal cruelty charges. The district court

consolidated the child abuse and animal cruelty convictions for sentencing. Defendants appeal.

## DISCUSSION

### I.      Sufficiency of the Evidence

**{7}**      Defendants contend that the evidence supporting their convictions for child abuse by endangerment is insufficient. We review sufficiency of evidence claims under a substantial evidence standard of review. *See State v. Willyard*, 2019-NMCA-058, ¶ 22, 450 P.3d 445. This standard "take[s] into account both the jury's fundamental role as fact[-]finder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641. The test is "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (internal quotation marks and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891 (alteration, internal quotation marks, and citation omitted).

**{8}**      "[C]hild abuse by endangerment occurs when an adult knowingly, intentionally, or negligently places a child 'in a situation that may endanger the child's life or health.' " *Id.* ¶ 15 (quoting Section 30-6-1(D)-(E)); *see also* UJI 14-612 NMRA (setting out the elements of child abuse not resulting in death or great bodily harm, which includes reckless child endangerment). In evaluating the sufficiency of the evidence in child endangerment cases, our Supreme Court has held, "to find that the accused acted with the requisite mens rea, the jury . . . must find that [the] defendant's conduct created a *substantial and foreseeable* risk of harm." *Chavez*, 2009-NMSC-035, ¶ 22 (internal quotation marks and citations omitted). "This standard more closely aligns with the legislative purpose that animates the child endangerment statute—to punish conduct that creates a truly significant risk of serious harm to children." *Id.* We consider the following factors in analyzing whether there was a substantial and foreseeable risk of harm to a child: (1) the gravity of the risk, which places "an individual on notice that his [or her] conduct is perilous and potentially criminal"; (2) whether the defendant's conduct violated a separate criminal statute; and (3) the likelihood of harm "which informs the court of the foreseeability of the risk when evaluating its magnitude." *State v. Schaaf*, 2013-NMCA-082, ¶ 9, 308 P.3d 160 (internal quotation marks and citation omitted). In assessing the degree of risk, we consider the length of time the conditions existed and the amount of supervision of the child. *Id.* "[T]he state must present specific evidence, including scientific or empirical evidence, connecting the circumstances to a substantial and foreseeable risk of harm[.]" *Id.*

**{9}** With the exception of limited evidence presented by Dr. Williams regarding potential harm to Children, the State's theory in this case was based primarily on "filthy living conditions." "[C]onditions in a home may, in some extreme circumstances, create a sufficiently dangerous environment to rise to the level of criminal child endangerment." *Chavez*, 2009-NMSC-035, ¶ 27. However, "the [s]tate has the burden to identify the specific dangers posed by the living environment and to present evidence to demonstrate that such filthy conditions endangered the child." *Id.* "Any dirty house can lead to illness or injury, but the critical difference that distinguishes a filthy house from conditions that are criminal is whether those conditions present a truly consequential and foreseeable threat of harm to children." *Id.* ¶ 37.

## A. Gravity of the Risk

**{10}** The gravity of the risk factor is primarily concerned with identifying the nature and extent of harm that potential hazards present. *See State v. Trujillo*, 2002-NMCA-100, ¶ 21, 132 N.M. 649, 53 P.3d 909 (stating that a defendant's conduct must create a substantial risk with "potentially serious consequences to the life or health of a child"). Setting aside the distinct and separate question of foreseeability, the gravity of the risk factor aims to measure the detrimental effect a given hazard would have if contact with such a hazard were to result in injury. *See State v. Trossman*, 2009-NMSC-034, ¶ 24-25, 146 N.M. 462, 212 P.3d 350 (vacating a child abuse by endangerment conviction on sufficiency grounds because there was no testimony presented that the child encountered hazardous conditions). As our Supreme Court explained, "[i]t is the gravity of the risk that serves to place an individual on notice that his conduct is perilous, and potentially criminal, thereby satisfying due process concerns." *Chavez*, 2009-NMSC-035, ¶ 23.

**{11}** Measuring the gravity of risk is made difficult by the imprecise and unquantifiable nature of the spectrum of harm. Nevertheless, our Supreme Court has indicated that in several cases "the seriousness of the threatened injury" was "apparent." *Id.* ¶ 24 (citing *State v. Graham*, 2005-NMSC-004, ¶ 10, 137 N.M. 197, 109 P.3d 285 (stating that the defendant left marijuana in areas accessible to the children, including a potent marijuana bud in a baby crib); *State v. McGruder*, 1997-NMSC-023, ¶¶ 5-6, 123 N.M. 302, 940 P.2d 150 (stating that the defendant fatally shot the mother's boyfriend before threatening to shoot the mother who was standing in front of her child in the line of fire), *abrogated on other grounds by Chavez*, 2009-NMSC-035, ¶¶ 2, 16, 47 n.1; *State v. Ungarten*, 1993-NMCA-073, ¶ 12, 115 N.M. 609, 856 P.2d 571 (stating that the defendant brandished a knife at the child's father while the child was standing directly behind the father, and the child testified that the knife came so close to his body that he "could not discern whether it was directed at him or his father"), *abrogated on other grounds by Chavez*, 2009-NMSC-035, ¶¶ 2, 16, 47 n.1; *State v. Guilez*, 2000-NMSC-020, ¶ 19, 129 N.M. 240, 4 P.3d 1231 (stating that the defendant failed to secure a three-year-old child in a safety seat and drove his truck while intoxicated at night without working head lights or tail lights before crashing into a fence), *abrogated on other grounds by State v. Santillanes*, 2001-NMSC-018, 130 N.M. 464, 27 P.3d 456.

**{12}**  *Chavez* involved an array of environmental conditions somewhat similar to those in and around Defendants' home, and our Supreme Court overturned a child abuse by endangerment conviction because the evidence was insufficient. *See* 2009-NMSC-035, ¶ 52. In *Chavez*, the defendant's home lacked gas utilities due to a disconnected propane tank, and it contained numerous hygienic deficiencies including moldy ceilings, a leaky shower, and rodent droppings, some of which were found inside the child's makeshift bed. *Id.* ¶¶ 6-9. The ground outside the home was covered in broken glass, and there was a collapsed shed with rusty protruding nails on the premises. *Id.* ¶ 7. The Court concluded that "the hazards present in [the d]efendant's home [did] not present the sort of risk anticipated by our Legislature" and "[w]ithout additional evidence, the risk of harm was only speculative, indicating that the defendant's conviction was based on the condition of the home rather than the dangers arising therefrom." *Id.* ¶¶ 37, 43.

**{13}**  In contrast, in *Schaaf*, we upheld the defendants' child abuse by endangerment convictions based on evidence that the defendants used methamphetamine while caring for the children, left loaded firearms in areas accessible to the children and allowed the children to play with a "toy gun" that was a nearly identical replica of the loaded firearms. 2013-NMCA-082, ¶ 12. In that case, the defendants specifically admitted that they recognized the "real risks of harm present in the house and the potential [for] injury or death the children were exposed to[.]" *Id.* The Court highlighted the differences between the facts in *Schaaf* and *Chavez*, stating "[t]he current case is unlike *Chavez* where the alleged endangerment was based on a filthy house alone with only speculative and vague dangers." 2013-NMCA-082, ¶ 12. "Instead, the endangerment [*in Schaaf*] arose from a combination or risks that together were readily apparent and gravely dangerous." *Chavez*, 2013-NMCA-082, ¶ 12 (internal quotation marks and citation omitted).

**{14}**  In this case, the State's evidence did not prove that the gravity of harm presented by the conditions on Defendants' property was "readily apparent and gravely dangerous." *Id.* We acknowledge that Children lived in close contact with trash, building supplies, housing goods, feces, an open trash pit, animals, and spoiled food. As in *Chavez*, some of the environmental conditions in this case "create[d] *some degree of risk*, particularly for young children." 2009-NMSC-035, ¶ 35 (emphasis added). However, the State failed to present evidence that the *gravity* of these risks rose to the same level as the risks in cases where our courts have upheld convictions of child abuse by endangerment. *See, e.g.*, *id.* ¶ 24 (citing cases); *see also State v. Castañeda*, 2001-NMCA-052, ¶¶ 3, 14, 130 N.M. 679, 30 P.3d 368 (stating that the defendant drove while intoxicated on the wrong side of a divided highway with her children in the vehicle that were unsecured by seatbelts). Unlike in *Schaaf*, wherein the defendants used methamphetamine in addition to leaving loaded firearms in areas accessible to the children, here, there is nothing in the record to place Defendants on notice that their conduct was "perilous, and potentially criminal." 2013-NMCA-082, ¶ 9. While loaded weapons and illicit drugs like methamphetamine ipso facto pose clear potential dangers of serious harm, *see id.* ¶ 12 ("The presence of loaded firearms . . . presented an obvious and serious risk of harm."), the risks posed by trash piles, debris, spoiled food,

and the other environmental conditions in this case are neither as great nor as obvious as the risks presented by the totality of the circumstances in *Schaaf*.

**{15}** In situations where the magnitude of harm that could result from a potential hazard is not readily apparent, the State must establish a connection between the hazard and the potential harm. In *State v. Jensen*, the state claimed that the presence of rodent droppings throughout the home, including on the stove where the defendant cooked for the child, could have exposed the child to Hantavirus. 2006-NMSC-045, ¶ 14, 140 N.M. 416, 143 P.3d 178, *abrogated on other grounds by Chavez*, 2009-NMSC-035, ¶¶ 2, 16, 47 n.1. However, our Supreme Court was not persuaded by this argument because the state did not put on evidence at trial to assist the jury with understanding the risk of Hantavirus and the dangers it posed. *See id.*[2] Similarly here, the State failed to present evidence about the nature and extent of the likely resulting harm, and thus failed to establish the gravity of the risk to Children. While Dr. Williams did testify that many of the conditions posed "safety concerns" to Children and explained that exposure to fecal matter and spoiled food can cause outbreaks of salmonella, clostridium difficile, and E. Coli, Dr. Williams did not sufficiently articulate the gravity of the actual risk to Children or the likelihood they would become infected nor did she provide much detail about the effects of these diseases had Children caught them. Beyond vague characterizations of the hazards as "safety concerns," Dr. Williams only other conclusion was that E. Coli, "can make kids really sick and shut down their kidneys." In addition, while Dr. Williams testified that Children were underweight and had "expressive language delays," she failed to provide testimony establishing any connection between their low weight and/or language delays and the conditions present on Defendants' property.

**{16}** With respect to supervision or lack thereof, there is almost no evidence supporting any inference that Children were not properly supervised by Defendants. Dr. Williams did raise a concern because one of the Children had a finger injury that allegedly resulted from playing with a knife—an injury that occurred while one of the Children was under the supervision of Ryan Boggs. However, Child's knife injury does not support the State's case. The date the injury occurred is unknown, whether this is a common occurrence is unknown, and neither of Defendants were with one of the Children when the injury occurred. Dr. Williams also expressed concern about whether there was sufficient running water to avoid injuries developing into infections, but the record reflects that the family was not completely without water at the time of Deputy Wilder's investigation, the record is silent as to the length of time the family was without running water, and there is no indication in the record that any of Children developed an infection due to the lack of running water. On the whole, there is insufficient evidence for us to arrive at a determination regarding either the amount of supervision that Children had, or the length of time any of the conditions on the premises existed. *See Schaaf*, 2013-NMCA-082, ¶ 9.

---

2The defendant was ultimately convicted on other grounds, primarily because he provided alcohol to the child on a daily basis in quantities so great that the child was constantly sick. *See id.* ¶ 16.

**{17}** We have held that "the state must present *specific evidence, including scientific or empirical evidence*, connecting the circumstances to a substantial and foreseeable risk of harm[.]" *Schaaf*, 2013-NMCA-082, ¶ 9 (emphasis added). We repeat our caveat that some risks are obvious—e.g., leaving loaded firearms and illicit drugs in areas easily accessible to children—and we do not hold that an expert is always required in each and every circumstance to link hazards to appreciable harm. Nevertheless, in cases where the dangers presented by hazards need to be explained in order for the gravity of risk to be adequately quantified, the conclusory testimony of an expert witness does not satisfy this requirement. Here, the State could have presented lab testing indicating that the bacteria Dr. Williams was concerned about was present in the RV or expert testimony about the likelihood of Children getting sick *under the circumstances of this case.* But the State did not give the jury any basis on which to draw its own conclusions about the magnitude of the risk in this case. There was no evidence that Children actually had occasion to ingest or even touch the feces, the trash pit, spoiled food, or bug spray. Dr. Williams' comments did not aid the jury in coming to an appreciable understanding of the specific harms that could have resulted from exposure to the hazards at issue in this case because her testimony is neither specific, nor empirical. Further, Dr. Williams's testimony that there was "a significant risk" to the "health and safety" of the children is conclusory and failed to provide a sufficient nexus between the environmental conditions in this case and the risks she identifies. *Cf. Chavez*, 2009-NMSC-035, ¶ 37 ("The problem with the  . . . case and [the]  record is the lack of any specific evidence connecting [the] conditions to a substantial and foreseeable risk of harm."). Accordingly, the first factor does not support Defendants' child abuse by endangerment convictions.

## B.      Violation of a Separate Criminal Statute

**{18}** Second, we consider whether Defendants violated a separate criminal statute. While Defendants pled no contest to, and were convicted of, charges of animal abuse, there is no evidence that Defendants' convictions implicate acts or omissions that had any effect on the wellbeing of Children. We have previously concluded that only those convictions for other criminal acts, which somehow contribute to the endangerment of the child or children at issue, are relevant to our analysis. *See Schaaf*, 2013-NMCA-082, ¶¶ 17-19 (affirming the defendant's child abuse conviction because, in addition to a dirty residence, the defendant was convicted of using methamphetamine around the children); *see also Jensen*, 2006-NMSC-045, ¶ 17 (affirming that the defendant's child abuse conviction in part because the defendant was convicted of contributing to the delinquency of a minor based on his provision of alcohol to the child). Defendants were convicted of multiple counts of animal cruelty and extreme animal cruelty, yet in comparison to the separate criminal violations at issue in *Schaaf* and *Jensen*, there is nothing in the record to suggest that Defendants animal abuse convictions increased the potential danger to the children. Thus, the second factor does not support Defendants' child abuse by endangerment convictions.

## C.      Foreseeability of Harm

**{19}** Finally, we consider the foreseeability of harm to the children. In *Chavez*, our Supreme Court held that "although no longer the determinative factor, the likelihood that harm will occur remains an important consideration when evaluating the magnitude of the risk." 2009-NMSC-035, ¶ 26. The Court thus has "declined to uphold endangerment convictions where the risk of harm is too remote, which may indicate that the harm was not foreseeable." *Id.* (citing *State v. Clemonts*, 2006-NMCA-031, ¶ 16, 139 N.M. 147, 130 P.3d 208 (reversing a child endangerment conviction where the defendant committed misdemeanor traffic offenses while engaged in a low-speed police chase with children); *State v. Roybal*, 1992-NMCA-114, ¶ 32, 115 N.M. 27, 846 P.2d 333 (reversing child endangerment conviction where the defendant left his six-year-old daughter in a car near a drug transaction but removed the child from any actual threat of harm); *Jensen*, 2006-NMSC-045, ¶ 10 (holding that the state must prove that "a defendant place[d] a child within the zone of danger and physically close to an inherently dangerous situation")).

**{20}** Like gravity of the risk, foreseeability of harm is not easily susceptible to quantification. Nevertheless, it aims to measure the probability that a given harm will result from exposure to a particular hazard. *See Trossman*, 2009-NMSC-034, ¶ 24 (noting that "if the [s]tate had produced evidence that [the d]efendant had allowed her child to be present during the process of methamphetamine production, or had stored such dangerous chemicals in ways that could have harmed the child, we would be highly inclined . . . to conclude that there was sufficient evidence that she placed her child's life or health at risk"). The relevant conduct must create more than a "possibility" of harm before it may be punished. *See Chavez*, 2009-NMSC-035, ¶ 18.

**{21}** Dr. Williams testified that exposure to fecal matter around the property and potential spoiled meat in the trash pit could expose Children to salmonella, clostridium difficile, and E. Coli. However, the State failed to present evidence that Children were ever directly exposed to fecal matter or spoiled meat, nor did the State establish that any of Children ever contracted an infectious disease. Indeed, Deputy Wilder conceded as much—he never saw Children playing unsupervised around any of the potential hazards nor did he have any evidence that Children played in the trash pit. Thus, the State failed to establish that the likelihood of any of these harms occurring was more than a mere "possibility." *Id.* Similarly, the State failed to demonstrate a connection between Children's low weights and language delays and the conditions in and around the RV.

**{22}** In short, while the State's evidence established numerous *potential* sources of harm, the State failed to specify to any degree, what the likelihood was that specific harms would occur, nor did the State demonstrate a causal link between those possible harms and any actual injurious effects on Children's wellbeing. *See Schaaf*, 2013-NMCA-082, ¶ 9 (stating that "the state must present specific evidence, including scientific or empirical evidence, connecting the circumstances to a substantial and foreseeable risk of harm"). By failing to present specific evidence demonstrating an association between the risks present and the health and well-being of Children, the State did not meet its burden to show Defendants acted with a "conscious[] disregard

[of] a substantial and unjustifiable risk of such nature and degree" that any law-abiding person would behave differently. *See State v. Consaul*, 2014-NMSC-030, ¶¶ 36-37, 332 P.3d 850 (highlighting that "the Legislature did not mean to punish ordinary acts of negligence when it amended the child abuse statute to require proof of recklessness").

**{23}**     For the foregoing reasons, we vacate Defendants' convictions of child abuse by endangerment. Given that there was insufficient evidence to support Defendants' child abuse by endangerment convictions, we need not address Defendant Allen Quick's other arguments relating to those convictions.[3]

## II.     Double Jeopardy

**{24}**     We turn now to Defendant Allen Quick's argument that the animal cruelty convictions violated his right against double jeopardy under a "unit of prosecution" theory. Defendant Allen Quick contends that the Legislature did not intend to prosecute each instance of animal cruelty separately, and thus his multiple convictions for animal cruelty violate the prohibition against double jeopardy.

**{25}**     "The Double Jeopardy Clause of the Fifth Amendment, enforced against the states by the Fourteenth Amendment, protects defendants from receiving multiple punishments for the same offense." *State v. Ramirez*, 2018-NMSC-003, ¶ 38, 409 P.3d 902 (internal quotation marks and citation omitted). Although there are two classifications of multiple punishment cases, *id.* ¶ 39, Defendant Allen Quick challenges his animal cruelty convictions solely under a unit of prosecution theory. We apply a two-part test in a unit of prosecution analysis. *Id.* ¶ 47. We begin by reviewing the statutory language of the criminal statute. *Id.* "If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete." *Id.* (internal quotation marks and citation omitted). In cases where ambiguity exists, we analyze whether "a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the statute." *Id.* (internal quotation marks and citation omitted).

**{26}**     Defendant Allen Quick failed to develop an argument in support of his position and altogether failed to provide an analysis of the first prong of the unit of prosecution test. *See State v. Flores*, 2015-NMCA-002, ¶ 17, 340 P.3d 622 (stating that we "will not rule on an inadequately-briefed issue where doing so would require this Court to develop the arguments itself, effectively performing the parties' work for them" (internal quotation marks and citation omitted)). And, while the State fully addressed the unit of prosecution analysis, Defendant Allen Quick again, in his reply brief, failed to respond to the State's argument. *Cf. Delta Automatic Sys., Inc. v. Bingham*, 1999-NMCA-029, ¶ 31, 126 N.M. 717, 974 P.2d 1174 ( "[The p]laintiffs' reply brief contains no response to this argument. In this circumstance, such a failure to respond constitutes a concession on the matter. This Court has no duty to search the record or research the law to 'defend'

---

3Defendant Allen Quick also argued that the district court erred in: (1) admitting the State's expert testimony in violation of the confrontation clause; (2) failing to instruct the jury on general criminal intent; (3) denying a mistrial; and (4) violating his right to a speedy trial.

in a civil case a party that fails to defend itself on an issue." (citations omitted)). Thus, we decline to address Defendant Allen Quick's double jeopardy argument and affirm Defendant Allen Quick's convictions for animal cruelty and extreme animal cruelty.

**CONCLUSION**

**{27}** For the foregoing reasons, we reverse Defendants' child abuse convictions and otherwise affirm.

**{28}   IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**ZACHARY A. IVES, Judge**